## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

TRUSTEES OF THE TEAMSTERS )
UNION LOCAL NO. 142 PENSION )
TRUST FUND, )
           )
           Plaintiff, )
           )
           v. )      CAUSE NO.: 2:07-CV-289-TS
           )
ACTIN, INC., )
           )
           Defendant. )

## OPINION AND ORDER

This matter is before the Court on the Plaintiff's Motion for Default Judgment [ECF No. 33], filed pursuant to Federal Rule of Civil Procedure 55(b)(2). The Plaintiff obtained an entry of default against the Defendant and now seeks default judgment in the amount of $132,103.06 as the amount that is authorized by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(g), and the parties' governing agreements. The Defendant filed its Response to Plaintiff's Motion for Default Judgment [ECF No. 35] to dispute the Plaintiff's calculation of damages and to request an evidentiary hearing.

## PROCEDURAL BACKGROUND

On August 31, 2007, the Plaintiff, Trustees of the Teamsters Union Local No. 142 Pension Trust Fund, instituted this lawsuit by filing its Complaint seeking employer contributions to an employee pension trust fund pursuant to successive collective bargaining agreements between the Defendant, Actin, Inc. (the employer), and the union, which represents some of the Defendant's employees. The Plaintiff brought its Complaint under ERISA, 29 U.S.C. § 1132(a)(3), (e)(1), and (f), and Section 301(a) of the Labor Management Relations Act

of 1947 (LMRA), as amended, 29 U.S.C. § 185(a).

Following an application for entry of default, on January 22, 2008, the Clerk entered a Default [ECF No. 8] against the Defendant pursuant to Federal Rule of Civil Procedure 55(a) because the Defendant had failed to plead or otherwise defend. On May 30, Attorney Brian L. Goins filed his Appearance [ECF No. 12] on behalf of the Defendant.

On December 3, the Plaintiff filed a Motion for Summary Judgment and a Memorandum of Law in Support, to which the Plaintiff attached evidentiary materials. On December 24, the Defendant filed a Motion to Vacate the Clerk's Entry of Default. Both parties filed further briefing and submitted additional evidentiary materials. On July 27, 2009, the Court denied the Defendant's Motion to Vacate the Clerk's Entry of Default, finding that it did not present good cause for the default, quick action to correct the default, or a meritorious defense to the Complaint. In consideration of the entry of default, and the apparent factual disputes related to damages (namely, payments made or missed by the Defendant and classification of employees for contribution purposes), the Court determined that the Plaintiff's Motion for Summary Judgment was not the most appropriate vehicle to address the remaining issues and that, instead, the Court would proceed as Rule 55(b)(2) contemplated, with the Plaintiff making application for default judgment and providing the requisite notice, the parties submitting briefs, and the Court conducting a hearing, if necessary, to afford the parties an opportunity to present evidence and argument.

On October 16, 2009, the Plaintiff filed a Motion for Default Judgment and Memorandum of Law in Support, requesting the entry of default judgment in the amount of $132,102.06. The Plaintiff submitted the affidavits of Jay Smith, Cheryl McCumber, and

Terrence Truesdale with attached documents in support of its request. Smith is the fund manager of the Teamsters Union Local No. 142 Pension Trust Fund responsible for the collection of employer contributions to the pension trust fund. He commissioned Legacy Professionals LLP (Legacy) to conduct payroll audits. McCumber is the supervising compliance auditor with Legacy, who conducted a payroll audit (report dated July 2, 2008) for the period of January 1, 2004, to May 31, 2008. Truesdale is also a compliance auditor with Legacy. He prepared a second audit report (dated August 3, 2009) listing the amounts the Defendant should have paid to the pension fund during the period from June 1, 2008, through June 30, 2009. In support of its request for attorney's fees and costs, the Plaintiff submitted the affidavit of Teresa Massa with an attached invoice.

On November 2, the Defendant filed its Response to Plaintiff's Motion for Default Judgment. The Defendant argues that it has made all contributions due for the period of time covered by McCumber's July 2, 2008, audit report, that the report is inaccurate and unreliable and includes findings that contributions were due for employees who were laid off or not subject to the collective bargaining agreement, and that the Defendant was justified in withholding the contributions addressed in the second audit because the Plaintiff refused to apply the Defendant's contributions for the periods for which they were submitted. The Defendant provides the affidavit of Paula Callahan, the office manager and payroll officer for the Defendant, in support of its objections to the Plaintiff's damages calculation. The Defendant requests an evidentiary hearing to resolve issues related to damages.

The Plaintiff maintains that an evidentiary hearing is not necessary as this is a routine collection action with evidence typically relied upon for proof.

# ANALYSIS

Rule 55, which governs the entry of default and the entry of default judgment, creates a two-step process: "the establishment of the default, and the actual entry of a default judgment. Once the default is established, and thus liability, the plaintiff still must establish his entitlement to the relief he seeks." *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004); *see also Lowe v. McGraw-Hill Cos., Inc.*, 361 F.3d 335, 339 (7th Cir. 2004) (stating that there is a clear distinction "between the entry of default and the entry of a default judgment"). The first step is satisfied when the clerk enters a party's default because it has "failed to plead or otherwise defend" and this "failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). "Upon default, the well-pleaded allegations of the complaint relating to liability are taken as true." *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). The second step—the entry of default judgment that is anticipated by subsection (b) of the Rule—may only be entered against "a defendant who has been defaulted." Fed. R. Civ. P. 55(b).

Rule 55(b) contemplates that, after default is entered, a party must apply to the court for a default judgment when the plaintiff's claim is not for a sum certain or a sum that can be made certain by computation, and the court may then render default judgment. The Seventh Circuit has made the following observation regarding the determination of the amount of damages after a party has defaulted in defending against a lawsuit:

> Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty.

*In re Catt*, 368 F.3d at 793 (citation marks omitted). Under Rule 55(b)(2), the court has the discretion to conduct hearings "when, to enter or effectuate judgment, it needs to: (A) conduct an

accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." The court need not conduct an evidentiary hearing if it can determine the proper amount of damages based upon "definite figures contained in documentary evidence or in detailed affidavits." *Dundee Cement Co.*, 722 F.2d at 1323; *see also e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007).

At this stage of the proceedings, the Defendant may dispute the calculation of damages, but it cannot dispute the well-pleaded allegations set forth in the Plaintiff's Complaint. *See Black v. Lane*, 22 F.2d 1395, 1399 (7th Cir. 1994) (stating that when default is entered, the facts alleged in the complaint may not be contested). The facts alleged in the Complaint in this case include that the Defendant is bound by a collective bargaining agreement that requires it to make periodic contributions on behalf of its employees to a pension trust fund created by and maintained pursuant to a trust agreement. The trust agreement grants the Plaintiff Trustees power to demand and collect contributions and to take any and all steps that may be necessary or desirable to effectuate the collection or preservation of contributions or other money. Pursuant to the trust agreement, the Plaintiff has the right to have payroll records of the employer audited by a reputable firm of certified public accountants if the employer is found to be delinquent in contributions, with the employer paying the cost of any such audit. If the employer is delinquent in making contributions, it must, according to the trust agreement, pay interest and all expenses of collection including costs and attorney's fees. The Plaintiff has the authority to assess liquidated damages against the employer who is delinquent in making contributions. The Defendant in this case violated its obligations under the collective bargaining agreement and the trust agreement when if failed to make required pension fund contributions.

As to the applicable law, ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. ERISA also provides:

> In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—
> (A) the unpaid contributions,
> (B) interest on the unpaid contributions,
> (C) an amount equal to the greater of—
> > (i) interest on the unpaid contributions, or
> > (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
> (E) such other legal or equitable relief as the court deems appropriate.
> For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

29 U.S.C. § 1132(g)(2). In addition, the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185.

**A.     Calculation of Damages—Contributions, Interest, and Liquidated Damages**

The Plaintiff has provided several evidentiary items to support the calculation of damages

contained in its Motion for Default Judgment. The Plaintiff presents two payroll audits that calculate the amount due to the pension fund from January 1, 2004, to May 31, 2008, at $48,500 and from June 1, 2008, to June 30, 2009, at $43,480. According to the affidavit of Smith, the fund manager, on July 16, 2008, the Defendant made a payment of $9560, which the Plaintiff posted to the Defendant's account for contributions owed for 2007 and January 2008. This reduced the amount owed for contributions to $82,420. According to the trust agreement and a collection policy agreement in effect, the Defendant is liable to pay interest in the amount of 10% per annum and liquidated damages in the amount of 20%. Smith prepared a report to calculate interest, which totaled $12,420.73 ($8402 for the July 2008 audit and $4018.73 for the second audit). If the contribution amounts are correct, an additional $16,484 ($82,420 x 20%) is due to the Plaintiff as liquidated damages.

The July 2008 audit report states that the reasons for under reported contributions was an under reporting of weeks worked, under reporting of weeks worked on newly hired and rehired employees, wrong rate paid to the fund office, over reporting weeks worked on terminated employees, and not reporting weeks worked on employees. In the Notes and Procedures associated with the July 2008 audit, McCumber explains the process she used to conduct the payroll audit:

> We classified all the employees using the employer's contribution reports and master employee list. . . . Payroll records supplied were in-house one week at a time. Payroll was set up by department. Departments were #1—Mechanics, #2—Mechanics Helpers, #3—Drivers, #4—Field Laborers, #9—Field Superintendent, #10—Office Salaries, & #11—Office Salary. #1, #2, #3 and #9 were union. #10 was non-union, but had two employees that were being reported to the Pension Fund. These two employees were classified as office technicians as stated in the collective bargaining agreement. This department contained union and non-union employees. An example of the confusion was Department #10 contained office salaries. Paula Callahan and Leslie Swibes were secretaries and

were being reported. These two employees were in department #10. There were other department #10 employees that were not being reported. We asked why and were told this was a choice of the individual. One employee of Department #10 was a computer systems contractor that was paid through the payroll and not actually a full time employee of Actin, Inc.

We ran a test of new hire, re-hire, LOA, transferred, and terminated employees, and found discrepancies on the contribution reports. We performed a 100% payroll audit of all new hires, re-hired, LOA or absent, transferred, and terminated employees. This was very time consuming because some of the payroll records for earlier years were weekly reports. For 2006 to 2008 all bi-weekly paycheck reports for each employee for the entire year were listed on one page which made checking the reports much easier.

(Payroll Audit Report, Notes and Procedures, ECF No. 34-10.) The audit report provides a monthly breakdown of each employee, the reason for the deficiency or credit in their reported hours, and the total number of hours multiplied by the applicable rate to arrive at the contributions the Defendant owes the pension fund.

The Defendant has submitted the affidavit of its office manager and payroll officer, Callahan, in support of its objections to the Plaintiff's calculation of damages, specifically the results reported in McCumber's July 2008 audit report. In paragraph 10 of her affidavit, Callahan submits that she has reviewed all of the payroll records for the years 2004 through 2007, and that the Defendant's records indicate that the company has made all contributions due for the period covered by the July 2008 audit report. Callahan provides no further explanation or documentary evidence to support this statement, and it is of little to no evidentiary value. The Defendant cannot create an issue of fact on the basis of this unsupported statement, and the Court could not discount the audit findings on the basis of this conclusory and unsupported statement. The Court will disregard Callahan's conclusion for purposes of determining whether a hearing to address disputed facts is necessary. She does, however, make specific objections to certain of the audit findings, which the Court will address more fully.

Callahan disagrees with McCumber's finding that contributions were not paid for sixteen employees in March 2005, and submits that check stubs show that contributions were paid.[1] McCumber explains that in March 2005 the billing rate was $20 weekly for pension, and that the remittance form from the pension fund incorrectly listed the rate as $10 weekly. She states that the pension fund later recognized the error, that the Defendant then paid the additional $10 for some employees, but that her audit revealed that the correct amount was not remitted for sixteen of the employees. The Defendant characterizes McCumber's explanation as "an unsupported hearsay assertion that Defendant had agreed to pay an additional $10 per week." (Def.'s Resp. 3, ECF No. 35.) However, the contribution amounts that the Defendant agreed to pay are set forth in and governed by the collective bargaining agreements, which the Defendant does not dispute. The Defendant presents no other basis to challenge the rate and presents no evidence that the full $20 was paid for the employees identified in the audit.

Callahan states that instances characterized as under reporting in the audit were for persons who were laid off at the time, pointing specifically to five employee in January and February 2005. McCumber responds that all five of the identified workers appeared on the payroll records for the months of January and February 2005 and thus were not laid off. McCumber verifies that an employee will only appear on a payroll audit report if the employer's payroll records show that he or she performed work during that specific time period.[2] Callahan does not present any documentation originating from the company, the union, or the employees to show that the employees were, in fact, laid off.

---

[1] Callahan states that the check stubs are attached to her affidavit, but no check stubs were attached to the affidavit that was filed with this Court.

[2] The Court was not provided with the 2005 payroll records by either party.

Callahan submits that two employees for whom contributions were not reported were not subject to the collective bargaining agreement and thus not eligible to participate in the pension, but were erroneously included in the audit. (Callahan Aff. ¶ 8, ECF No. 35-2.) McCumber explains in her affidavit that these two employees, according to the Defendant's payroll check history report, are listed as category #10, office salaries. Office technicians and office clerical are unambiguously covered by the collective bargaining agreement, and the Defendant paid contributions on behalf of two other category #10 employees. In the Notes and Procedures for the August 2009 audit, the auditor notes that the employer admitted that the employer was fairly careless in how it classified employees during this time, and that the personnel files for these two specific employees did not explain their job classification. Thus, McCumber's decision to include these employees in the audit was supported by the circumstances and by the Defendant's failure to maintain adequate records.[3] Callahan alleges, without further explanation or support, that "[m]any other mistakes and errors exist throughout the [July 2008] Audit Report." (Callahan Aff. ¶ 9, ECF No. 35-2.)

The Court finds that the affidavits, audit reports, and related exhibits adequately substantiate the amount of delinquent contributions sought for the period from January 1, 2004, to June 30, 2009. The Defendant has not presented competing documents or evidence to put the audit results in dispute. Despite the Defendant's assertion that the Court must conduct a hearing to determine whether to believe the Legacy auditors or the Defendant's payroll officer, this is not an instance where the Court must assess the credibility of witnesses or conduct further investigation to calculate damages with reasonable certainty. The issue is not whether the

---

[3] Although these employees were eventually excluded from the second audit, it was only after they signed an Affidavit and Waiver of Group Insurance Participation.

auditors are credible, but whether their reports are accurate. Callahan's unsubstantiated statements are inadequate to create a genuine issue of fact regarding the accuracy of the audits, and the Court can rely on the definite figures contained in the documentary evidence and the detailed affidavits. The Defendant complains that McCumber is not trained to interpret a collective bargaining agreement, but it has not pointed to any ambiguity in the agreement or any misapplication of the agreement terms by McCumber. The Defendant states that the audit report contains numerous inaccuracies, but does not present any documentary evidence to dispute the auditors' findings.

The Defendant does not make any specific objections to the accuracy of the second audit, but argues that the Defendant properly refused to remit pension contributions beginning in June 2008 because of the ongoing litigation. In her affidavit, Callahan asserts that the Defendant insisted that it had paid all that was due, but that the Plaintiff refused to apply its current contributions to the time period for which they were submitted and sought to apply them to disputed amounts for liquidated damages and attorney's fees. The Defendant argues that rather than continue to make timely contributions only to have them applied to disputed amounts, the Defendant began withholding contributions. The Plaintiff responds that the Defendant has not presented any legal authority that would allow it to withhold payment of contributions because it disputed portions of the payroll audit. In response to the Defendant's argument that the fund misapplied contributions to certain time periods, the Plaintiff points to language in the trust agreement that gives the fund discretion and authority to administer the fund as it deems appropriate for the benefit of the fund and its members.

This is a legal issue that does not require an evidentiary hearing. The collection policy,

attached to Smith's affidavit as Exhibit I, states:

> Except as otherwise provided in any settlement agreement or installment payment agreement, any amount paid to the Fund by a delinquent employer shall first be applied to the oldest charges then due, including contributions, interest and liquidated damage charges, notwithstanding any contrary designation by the delinquent employer in connection with its payment.

(Employer Contribution Collection Agreement ¶ 15, ECF No. 34-25.) There is no evidence that the Defendant made the $9560 payment on July 16, 2008, as part of any settlement agreement or installment payment agreement. The parties' agreement contemplates that the payment would thus be applied to the oldest charges, and it makes no exception for amounts that are in dispute. When the Defendant decided to discontinue making payments and did so without any agreement with the Plaintiff, it became delinquent on its current obligations. The Defendant's argument does not warrant an evidentiary hearing or a finding that the second audit was not necessary or accurate.

The Defendant's challenge to an award of interest and liquidated damages is dependent on the Court first finding that the Defendant is not delinquent in its contribution to the pension fund. Because the Plaintiff has established that the Defendant owes $ 82,420 in contributions, the Court also finds that liquidated fees in the amount of $16,484 are supported by the language of ERISA and the trust and collection agreements. The Defendant's calculation of interest at a rate of 10% per annum (for a total of $12,420.93) is also supported by the trust collection agreements.

**B.    Attorney's Fees and Audit Costs**

ERISA requires a court to award reasonable attorney's fees and costs to a prevailing

fiduciary in an action to collect delinquent contributions. 29 U.S.C. § 1132(g)(2). The parties'

collection agreement requires the Defendant to pay the costs of an audit. The amount of

attorney's fees and costs for collections efforts in this matter total $10,241.20 and are supported

by the affidavit of the attorney who performed the work and by attached invoices. (Aff. of

Attorney's Fees, ECF No. 34-2; Invoice, ECF. No. 34-3.) The number of hours expended, 51.85

hours, multiplied by Attorney Massa's hourly rate of $175 to $200 and law clerk rate of $90

results in $9782.25 in attorney's fees. *See Stark v. PPM Am., Inc.*, 354 F.3d 666, 674 (7th Cir.

2004) (noting that a reasonable fee can be calculated using the "lodestar" method, which is the

"product of an attorney's reasonable hourly rate and the number of hours reasonably expended").

Attorney Massa states that her rate is a negotiated rate and that her firm believes that it is below

the usual and customary fee charged for the type of work involved in this case. Smith, the

pension fund manager since 1994, states in his affidavit that he has reviewed each bill received

for attorney's fees, including for work performed in this lawsuit, and believes that they are

reasonable. The invoice states the identity of the attorney providing the services, the nature of

the work performed, the date when the work was performed, and the number of hours expended

on the tasks. The invoice shows that $459.95 was charged for the federal filing fee, copying

costs, and postage charges. The total amount invoiced for legal services and costs is $10,241.20.

   The affidavits and itemized billing statement substantiate the amount sought in attorney's

fees and costs. The only arguments the Defendant offers to challenge the award of fees are that *if*

it was not delinquent in paying pension contributions, it should not be assessed fees; that quarter-

hour increment billing and block billing—that is, recording in one time entry a number of

different tasks without allocating the specific amount of time spent on each of the different

tasks—are improper; and that any such entries should be reduced by 20% across the board (or by 40% if they are both a block billing and a quarter-hour increment). The Defendant does not address specific fees or costs or challenge the hourly rate.

Hours spent are not reasonably expended if they are excessive, redundant, or otherwise unnecessary. *Stark*, 354 F.3d at 674. "Although 'block billing' does not provide the best possible description of attorneys' fees, it is not a prohibited practice." *Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 569 (7th Cir. 2006). Here, the invoice identifies the date the work was performed and adequately describes the work that was done for each billing entry. The total time that was expended for the reported tasks does not appear to be unreasonable or unnecessary such that any reduction is warranted. Billing in quarter-hour increments, in and of itself, is not barred by ERISA. In other words, there is no statutory provision forbidding billing in quarter-hour segments. Moreover, nothing in the record suggests that the times allotted were not accurate. Some of the entries were for .25, .5, .75, etc., but others within the same time period were for .10, .20, .30, .40, .60, and .80 (Invoice, ECF No. 34-3), suggesting that the billing attorney kept close track of time and did not simply round up to the nearest quarter hour. The Defendant has not established that a reduction should be made for any time that was billed in quarter-hour increments. The Court finds that $9782.25 in attorney's fees is reasonable.

However, postage costs are not generally recoverable as costs. *See Whal v. Carrier Mfg. Co.*, 511 F.2d 209, 217–18 (7th Cir. 1975) (discussing costs in the 28 U.S.C. § 1920 context). The invoice includes $44.61 in postage charges. Because the Court finds it reasonable to apply the 28 U.S.C. § 1920 categories of costs to be taxed in the context of this case, the Court will deduct these charges. Facsimile transmittal charges are also absent from the categorical list of

recoverable expenses and, as an ordinary business expense, must be borne by the party incurring the cost. In addition, the Plaintiff's affidavit and invoice provide no basis for the Court to determine that the photocopying costs were reasonable, either in the cost per page or in the necessity of the copies in relation to the Plaintiff's collection efforts. The only cost that is recoverable and adequately supported by the record is the $350 district court filing fee, and the remaining $108.95 requested as costs will be excluded.

Turning to the costs of the audits performed by Legacy, the Plaintiff was billed $7000 for the first audit and $3535.93 for the second (for a total of $10,535.93) according to the affidavits of the auditors and Smith. The Defendant challenges the audit costs on grounds that the auditor's billing for the first report was not itemized, and that both auditors used quarter-hour increments for billing, which likely resulted in over-billing for ministerial tasks such as making phone calls. The Defendant also argues that "much of the time alleged to have been spent on the audits was spent on unproductive activities or tasks that were unnecessary, duplicative, or redundant." (Def.'s Resp. 11; ECF No. 35.) The basis for the argument that McCumber spent time on unproductive activities is Callahan's affidavit testimony that "[t]he amount being charged for the audit is most likely excessive, given that much of the time that the auditor was on site at Actin, she was engaged in non-productive activity such as conversing with employees regarding non-work matters and smoking outside of the front door." (Callahan Aff. ¶ 14; ECF No. 35-2.) The Defendant does not provide any basis for its argument that the auditor billed time for tasks that were unnecessary, duplicative, or redundant.

In response, the Plaintiff presents the supplemental affidavit of Cheryl McCumber and an itemized audit invoice. McCumber explains that Legacy charged the pension fund a discounted

rate and that the original $8230.94 in charges was billed to the fund as $7000. The itemized

invoice shows that McCumber spent four days at the Defendant's office, and that her billing rate

was $115 per hour. She also attests in her affidavit that she worked diligently in conducting the

document review while at the Defendant's offices, working without a lunch break, which is her

custom. She states that the technical review of her audit by her supervisor took an unusual

amount of time (3.50 hours as compared to the typical 1.00 to 2.00 hours) because of the large

number of documents to review and the additional notes she had to make to address the

disarrayed condition of the Defendant's documents. Legacy also conducted a quality control

review to double check numerical calculations.

Even if some of the time McCullen spent at the office was in conversation with

employees about non-work matters and even if she took breaks at times during the day,

Callahan's statements do not establish that the invoice was not an accurate reflection of the time

actually spent on auditing tasks. The Defendant does not identify the portions of the audit that it

contends were unnecessary, duplicative, or redundant. Assuming that the Defendant was

referring to the technical review and quality control review that Legacy performed, the Court

agrees with the auditor that these phases of a payroll audit are necessary to ensure its accuracy.

By agreement, the Defendant is obligated to pay the cost of an audit performed by a reputable

firm of certified public accountants when the employer is found to be delinquent in employer

contributions.[4] Under ERISA, audit costs are part of the relief due to a prevailing plaintiff under

29 U.S.C. § 1132(a)(2)(E) as "other legal or equitable relief." *See Moriarty ex rel. Local Union*

---

[4] Legacy is a certified public accounting firm with specialties that include serving as independent auditors to collectively bargained, multi-employer and single employer benefit plans, and it is a member of the American Institute of Certified Public Accountants Employee Benefit Plan Audit Quality Center for CPA firms. Legacy Professionals LLP, http://www.legacycpas.com/pages/benefit_plans/13.php (last visited Sept. 24, 2010).

*No. 727 v. SVEC*, 429 F.3d 710, 721 (7th Cir. 2005). There is no language in the agreement or the statute that prevents billing in quarter-hour increments. The Defendant has not shown that any particular entry of time was unreasonable in relation to the task performed, the condition of the Defendant's payroll records, or the period of time under review. Smith states that he has, in his role as fund manager, reviewed audit results and approved payment for well over one hundred payroll audits, and that the amount charged for Legacy's audits covering multiple time periods is reasonable. The Plaintiff's documentary evidence shows that the audit costs of $10,535.93 are reasonable for the scope of work performed.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Default Judgment [ECF No. 33] is GRANTED. The Court ORDERS that judgment be entered in favor of the Plaintiff and against the Defendant in the amount of $131,993.11, which amount represents unpaid contributions, interest, liquidated damages, attorney's fees, and audit costs.

SO ORDERED on September 28, 2010.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION